# Lewis *v.* Philadelphia, Appellant.

*Municipalities—Municipal contracts—Collusion between city officials and contractor—Findings of fact.*

1. A finding of fact by a chancellor that a municipal contract was entered into by a fraudulent combination between the city officials and a contractor, will not be reversed by the appellate court where the established facts amply warrant such finding.

*Municipalities—Municipal contract—Supplemental contract— Repair of streets—Advertising—Competitive bidding.*

2. Where a municipal contract for repairing the streets of a city during a particular year declares that the amount to be paid shall not exceed a sum stated, "being the amount at present appropriated and available for that purpose," and further provides that when further appropriations are made the contractor will, at the request of the city, enter into additional contracts for the continuance of the work during the year "at the prices herein provided, and in accordance with the proposal and specifications hereto attached" the city cannot enter into a supplemental contract with the same contractor without the necessary legal prerequisites of advertising and competitive bidding.

Mr. Justice Elkin dissents.

Argued Jan. 10, 1912. Appeal, No. 86, Jan. T., 1911, by defendants from decree of C. P. No. 2, Phila. Co., Sept. T., 1910, No. 3899, on bill in equity in case of Theodore J. Lewis, S. Weir Mitchell, Wm. M. Longstreth, Arthur H. Lea, Andrew R. Wright, Charles F. Jenkins, Barton C. Hirst, Cyrus D. Foss, Jr., Newbold Etting, Logan M. Bullitt and Charles C. Binney v. City of Philadelphia; John E. Reyburn, Mayor of the City of Philadelphia; John M. Walton, Controller of the City of Philadelphia; Murrell Dobbins, Treasurer of the City of Philadelphia; George R. Stearns, Director of the Department of Public Works of the City of Philadelphia; Wm. R. Benson, Chief of the Bureau of Highways of the City of Philadelphia; Filbert Paving and Construction Company, a Corporation Organized Under the Laws of the State of Delaware; Richard Y. Filbert

and B. F. Richardson.  Before FELL, C. J., BROWN, MESTREZAT, ELKIN and STEWART, JJ.  Affirmed.

The opinion of the Supreme Court states the facts.

*Error assigned* was decree awarding injunction.

*Hampton L. Carson,* with him *John Kent Kane,* for appellant.—The judges in the lower courts distinctly have declared that in certain cases supplemental contracts are legal.  There is no ruling of this Court which contravenes or denies this: Smith v. Philadelphia, 17 Pa. D. R. 231; Clark v. Pittsburgh, 217 Pa. 46; Smith v. Philadelphia, 17 Pa. D. R. 381; Sheppard v. Philadelphia, 17 Pa. D. R. 636; Croasdill v. Philadelphia, 18 Pa. D. R. 719; Smith v. Philadelphia, 227 Pa. 423.

The contract and the so-called supplemental contract in the case under discussion at bar, are integral parts of each other: Smith v. Philadelphia, 227 Pa. 423.

The advertisement covered the work being done under the agreement for the year 1910, and the appropriation was more than sufficient.

There was no legal evidence of a conspiracy either in the formation, or performance of the contract: Filbert v. Philadelphia, 181 Pa. 530; Ballantine v. Cummings, 220 Pa. 621.

*Thomas Raeburn White,* for appellees, cited Nelson v. New York, 131 N. Y. 4 (29 N. E. Repr. 814) ; Anderson's Case, 109 N. Y. 554 (17 N. E. Repr. 209).

OPINION BY MR. JUSTICE MESTREZAT, March 18, 1912:
This bill was filed by certain citizens, residents and taxpayers of the city of Philadelphia against the city, its officers, and the Filbert Paving and Construction Company, and prays that a contract and supplemental contract between the city and the company for repaving and resurfacing asphalt paved streets occupied by

tracks of the Rapid Transit Company be declared void, and that the company be required to account for the money paid to it under the contracts. After the proper advertisements, the contract was executed on June 29, 1910, and required the company to furnish the material and perform the work in repaving and resurfacing the streets during the year 1910. It declares that the amount to be paid for the materials and the work "shall not exceed the sum of $50,000, being the amount at present appropriated and available for that purpose." The contract further provides that when further appropriations are made the company will, at the request of the city, enter into additional contracts for the continuance of the work. The supplemental contract was executed on August 4, 1910, and provides that the original agreement "shall be amended so that the amount to be expended shall in no event exceed $200,000 instead of $50,000."

The bill charges that the contract and supplemental contract were entered into in violation of law and in collusion with the city officials in pursuance of a conspiracy to cheat and defraud the city, that the supplemental contract was void for the further reason that it was not preceded by any advertisement for bids for the work covered by it, and that the company had negligently and fraudulently returned false measurements of work actually done and claimed and received payments of money according to rates contrary to the spirit and intent of the contract. The learned court found that the supplemental contract was invalid because its execution was not preceded by advertisement or competitive bidding, and that it was the result of an unlawful combination between the department of public works and the Filbert paving and Construction Company to defeat the provisions of law relative to advertising and competitive bidding, and entered a decree declaring it to be illegal and void and restraining the controller from approving, and the city treasurer

from paying, any warrants for moneys claimed to be
due the Filbert Paving and Construction Company for
work done under said contract; and further requiring
the Construction Company to account for the money
paid it under the sanction of the officers of the Bureau
of Highways acting under color of the said illegal
contract.   From this decree the Filbert Paving and
Construction Company took this appeal.

As said by the learned court below, the history of the
transaction makes the court's findings clear and its con-
clusion inevitable.   The story of the several transac-
tions leading up to and consummated in the execution
of the supplemental contract is found in the evidence
submitted on the trial of the cause.   The director of
public works in December, 1909, advertised for pro-
posals to repair the asphalt streets occupied by the
Rapid Transit Company's railway tracks.   The work
was divided into three classes, one in which the number
of square yards to be repaired in a given city square
was between 100 and 500 yards, one between 500 and
1000 yards, and one where it exceeded 1000 yards.   The
appellant company and Barber Asphalt Paving Com-
pany bid for each class of work.   Upon the basis of the
yardage of work done during the previous year, the
Barber Company was the low bidder.   The bids were all
rejected.   In May, 1910, there was a second advertise-
ment and bids were again submitted by the same bid-
ders.   There were, however, but two prices asked for:
one where the number of yards was between 100 and
500 in a given square, and the other where the number
exceeded 500 yards in a square.   The bid of the Barber
Company was the lower, but the Filbert Company
claimed that the Barber Company had been given ex-
clusive information as to the approximate quantities of
work to be done, and the bids were rejected.   There was
no force, however, in such claim as the Filbert Company
knew the amount of work which had been done the pre-
ceding year and that the bids would be computed on the

same amount of work. The learned court found: "The said claim of the Filbert Company was made by them for the purpose of obtaining a rejection of the bids, and to secure the insertion of misleading information in the next advertisement for bids." .

In June, 1910, there was a third advertisement and a third submission of bids, and the specifications required the bids to be computed on estimated quantities of work based on the amount of work of the same character done in 1909. These estimated quantities of resurfacing were 34,139.66 square yards in amounts over 100 and less than 500 square yards in a given city square, and 90,018.79 in amounts exceeding 500 square yards in a city square. The director of public works reserved the right to order work in different amounts at his discretion. The Filbert Company bid seventy-five cents for work in quantities of 100 to 500 yards, and twenty cents for work in quantities exceeding 500 yards in a given square; while the Barber Company bid sixty-three cents for each class of work. The Filbert Company was the low bidder, based on the estimated quantities of the work given in the specifications, and the contract was awarded to that company. The specifications on which the bids were made provided that the work should be done in strict accordance with the annexed specifications which were made a part of the bid and that contracts for work might be awarded and executed from time to time in the discretion of the department of public works. Prior to the submission of bids in June 1910 the Chief of the Bureau of Highways had in his possession information showing that the total yardage required in amounts less than 500 yards in a square was 70,800 square yards and the total yardage in amounts exceeding 500 yards in a square was 30,832 square yards. The learned court finds that when the Chief of the Bureau of Highways inserted the estimate given in the advertisement for bids he knew that the estimate was misleading, and further that the records

of the office of the director of the department of public works afforded precise information of what had been the actual requirement in making such repairs and how they had been met, and that from these records the officials could have ascertained approximately the probable amount of repairs of each class which would be required during the year 1910. The court also found that the general manager of the Filbert Company knew, when he submitted bids in June, that the estimated quantities stated in the advertisement for bids as to the probable amounts to be required during the year 1910 were untrue and misleading.

It will be observed that the bid of the Filbert Company was grossly unbalanced and, as was found by the court, was notice to the officers of the city that some fraud was contemplated. On the estimate given in the advertisement it is obvious that the bid of twenty cents would net a large loss to the contractor for every yard done and it is equally clear that on the seventy-five cent bid there would be a large profit. The bid, however, was accepted.

Of the estimated quantities of resurfacing given in the advertisement, 72½ per cent. of the whole work was in amounts greater than 500 yards in a given square, and was to be computed at twenty cents per square yard, and 27½ per cent. was in amounts between 100 and 500 yards in a given square and was computed at seventy-five cents per square yard. When, however, the work was actually done and paid for under the contract prior to November 11, 1910, amounting to 176,924 yards, only 17 2-10 per cent. of the whole had been done in amounts exceeding 500 yards in a given square and paid for at twenty cents per square yard, and 82 8-10 per cent. of the whole had been done in amounts exceeding 100 yards and less than 500 yards and paid for at seventy-five cents per square yard. In addition the learned court finds: "On June 29, June 30, and July 1st, the day the contract was executed and

the two following days, orders were issued for 37,959 square yards of resurfacing at seventy-five cents and 4,400 square yards at twenty cents. Up to the time of the filing of the bill none of the said work ordered at twenty cents had been paid for and so far as the evidence shows none had been done." It is further found: "From June 29th to August 3rd inclusive, August 4th being the date of the supplemental contract, orders had been given for 126,260.15 square yards at seventy-five cents and for 39,362 square yards at twenty cents. Practically all of the said work ordered at seventy-five cents had been done and paid for prior to the filing of the bill. Of the 39,362 square yards at twenty cents, 33,325 square yards had not been paid for prior to the filing of the bill and so far as the evidence shows the work had not been done." In addition to this, from June 29th to August 3rd orders had been given amounting to 23,500 square yards in amounts of exactly 500 yards in a square. The total cost of the asphalt work done by the Filbert Company prior to November 1910 was $115,896.55, and the court finds that if the same amount of work had been done in the estimated proportion on which the bids were computed it would have cost only $62,143.15, or $53,753.40 less than the amount actually paid the Filbert Company.

In addition to the above it appears from the evidence, and is so found by the court, that more than one-half of the work done at seventy-five cents per yard was in amounts exceeding 400 and not exceeding 500 yards in a given square, that more than 15,000 square yards were in amounts exceeding 496 and not exceeding 500 yards in a square, that in a number of instances the officers of the Survey Department made report of measurements and approved bills under the contract in amounts equally or slightly less than 500 sqare yards in a given square, where the work actually done by the Filbert Company in the square was in excess of 500 square yards. From these and other facts the learned court

was amply justified in finding that the officers of the
city under the contract in suit gave orders for work in
amounts exceeding 100 yards and not exceeding 500
yards with intent to favor the contractor. There are
numerous other instances appearing by the evidence
which point to collusion between the contractor and
the city officials in letting the contract to the Filbert
Company, and which have been found and set out in
detail by the court.

From the established facts in the case, there is no
escape from the conclusion that the officers of the de-
partment of public works were in collusion with the
Filbert Company from the incipiency of the contract to
the filing of the bill in this case. When the advertise-
ments were made for bids in December, 1909, the de-
partment had before it the work of that year and, there-
fore, the data was in its possession, as found by the
court, from which it could have given approximately
correct estimates of the different classes of resurfacing
which would be required in 1910. The same informa-
tion was before the department when it advertised for
bids in May, 1910. Not only did the department have
such information, but the Filbert Company could have
obtained such knowledge from its own records and
doubtless did so. It was the merest pretext on the part
of that company in demanding of the department that
the lower bid of the Barber Company made in May,
1910, should be set aside because the latter company had
been given information as to the approximate quantities
of work to be done. The department of public works
and the Filbert Company both had the information
which was given to the Barber Company. The two
companies, therefore, stood upon the same footing as
to knowledge of the approximate quantities of work
which would be required to be done in the year 1910.
The learned court is fully sustained by the facts in find-
ing that the claim of the Filbert Company was made to
secure the insertion of misleading information in the

next advertisement for bids. In this it manifestly suc-
ceeded. The bid of the Filbert Company under the
third advertisement was an unbalanced bid, thus giving
to the company and to the department the opportunity,
by collusion, to aid a favorite contractor. The bid was
manipulated with a skill and in a manner that would
do credit to those who were trained in such matters.
The result is stated above. In the second bidding, the
Filbert Company bid forty-five cents for the work in
squares exceeding 500 square yards and thirty-six cents
for work in squares from 100 to 500 square yards.
Under its third bid, the Filbert Company was to do
nearly three-fourths of the work at twenty cents per
square yard and about one-fourth of it at seventy-five
cents per square yard. It will be seen that in compari-
son with its second bid, twenty cents was unreasonably
low for the work to be performed, and, as found by the
court, the work at twenty cents if done according to
the advertisement must have resulted in great loss to
the contractor. Why, therefore, was such a bid made?
It would be idle as well as absurd to assume that the
Filbert Paving Company intended to do the work at a
loss, and at so great a loss as would result from per-
forming the estimated proportion of the work at twenty
cents per square yard. It would be equally absurd to
assume that the Filbert Paving Company did not know,
at the time it made such bid, that it could protect itself
against a loss. Of course, such protection was not
within the power of the company itself but must neces-
sarily be brought about by the assistance of the depart-
ment of public works. Acting in concert, the city's offi-
cials and the Filbert Company could convert a manifest
loss which would result from a compliance with the
contract into large profits for the Filbert Company.
Under the bid and the specifications the opportunity
was afforded and the result shows it was readily em-
braced. In the first place, as found by the court below,
the department knew that the estimate was false and

misleading when it was inserted in the advertisement. The orders specifying the streets to be resurfaced under the contract were given from time to time to the contractor by an officer of the department of public works and by the asphalt inspectors in the several highway department districts. These officers, without the exercise of any discretion on the part of the Chief of the Bureau of Highways, issued orders for work calling for quantities over or under 500 square yards. This gave the desired opportunity for the city officials to add to the amount of the work to be done at the higher price and to lessen the work to be done at the lower price bid by the contractor. We have stated above what they actually did, and the extent to which they transferred the low priced work at twenty cents per square yard to the high priced work for which the city was to pay seventy-five cents per square yard, thereby disclosing unmistakably the fact that the city employees in the department of public works were acting in collusion with the contractor to defraud the city. By this conduct of the city employees, the low priced work estimated in the advertisement to be 72½ per cent. of the entire work and to be done at twenty cents per square yard had been diminished to 17 2-10 per cent. of the whole amount, and the high priced work estimated in the advertisement at 27½ per cent. of the entire amount of work and to be paid for at seventy-five cents per square yard was increased to 82 8-10 per cent. of the whole amount of work to be done. The unbalanced bid, as manipulated by the city officials in collusion with the contractor was, therefore, the efficient instrument by which a loss, which would necessarily have resulted to the contractor from compliance with his bid, was converted into a profit of over $53,000 to the contractor for the work done up to November 11, 1910. Not only did the contractor reap the benefit of the action of the city officials in issuing orders in undue proportion for work to be done in less amounts than 500 square yards,

but he was relieved from the five-year guaranty which he was required to give for all work done in quantities exceeding 500 square yards in a given square. No such guaranty was required with the work done in quantities of less than 500 square yards. The gain, therefore, to the contractor was more than the amount of additional money he received as he was relieved from the five-year guaranty contract. We think further discussion of this phase of the case is unnecessary.

The above recital of part of the facts is in itself amply sufficient to warrant the finding of the learned court below that there was fraud and collusion between the contractor and the city officials.

Most of the material facts were known to the department of public works at the time it entered into the supplemental contract of August 4, 1910. The director knew, as found by the court below, when he executed the supplemental contract that the twenty-cent work instead of being 72½ per cent. of the total, as he had assumed in his price formula, was by actual performance only 5 per cent., and that the seventy-five cent work instead of being 27½ per cent. was by actual performance 95 per cent. of the total. In short, he knew that he was paying seventy-two cents per square yard for the work. This was found by the court and is amply sustained by the evidence. In addition to other evidence, the attention of the director was called to these facts by a letter of July 13, 1910, in which the relative quantities of high priced and low priced work being done by the contractor were directly brought before him. This information was not only known to the head of the department but to the officers who gave the orders to the contractor to do the work. With this information before him, with the knowledge that under the contract of June, 1910, the contractor was doing only 5 per cent. of the work at the lower price and 95 per cent. of the work at the higher price, and the whole work at over seventy-two cents per square yard, the

director of the department entered into the supplemental contract agreeing to pay the same contractor $150,000 more for work at the same rate. The conclusion is irresistible that the conspiracy and collusion which attached to and tainted the original contract entered into the supplemental agreement.

The contract of August 4, 1910, was a supplemental agreement prohibited by the statutes and ordinances regulating municipal contracts, and was therefore invalid and not binding upon the city. The requisites of a valid municipal contract and the argreements forbidden by the statutes and ordinances applicable to the city of Philadelphia are pointed out in Smith v. Philadelphia, 227 Pa. 423. The learned counsel for the appellant seeks to differentiate the present case from Smith v. Philadelphia on the ground that the supplemental contract was authorized by the original contract and was merely an extension or an enlargement of the prior contract. With this contention we do not agree. The contract of August 4th was a new agreement entered into by the city and the contractor by which the latter was to perform work at the unit prices stated in the original contract "and in accordance with the proposals and specifications hereto attached" to the amount of $150,000. Had this agreement been made with another contractor on the same terms, it would not even be suggested that it was not an agreement separate and distinct from the contract of June 29, 1910. That it is between the same parties is wholly immaterial. Had it not been entered into, there would be no liability on the part of the contractor to perform the work nor any liability on the part of the city to pay for the work. It was a new agreement on the part of the contractor to repair and resurface the traction road streets with work and materials to the amount of $150,000.

The original contract provided that the work to be done under it should not exceed the sum of $50,000,

being the amount stated in the agreement as then appropriated and available for the purpose. Beyond that amount, the contractor could not bind the city for work done under the contract. He could recover nothing additional for work done, and the city could not compel him to do any additional work under the agreement. The contract was at an end between the parties, and any further work done in repairing or resurfacing the streets could legally be done only in pursuance of another contract duly executed by the parties. The parties attempted to acomplish this purpose by entering into a supplemental contract of August 4th without the requisite advertising and competitive bidding. This was not authorized by the original agreement. That contract declares that the amount to be paid for the work to be done under it should not exceed $50,000. In a subsequent clause a like declaration is made, but with the proviso: "Unless amended or supplemented as hereinbefore provided." The appellant relies on this proviso to give validity to the supplemental agreement. But the proviso is entirely inconsistent with the preceding paragraph in which the amount to be expended on the work is absolutely fixed at the sum named. Moreover, the proviso is rendered nugatory, as there is no provision "hereinbefore" for amending or supplementing the original agreement. The only prior provision relative to additional contracts is that on the expiration of the original agreement "a further contract or contracts." and not "amendatory or supplemental" contracts, may be entered into "at the prices herein provided and in accordance with the proposal and specifications hereto attached." It was a new or "further contract" according to the original specifications which the contractor was required to enter into at the request of the city. The proviso is therefore ineffective and necessarily falls.

That the original contract required the contractor to enter into a further contract at the request of the city

is wholly immaterial and does not validate the otherwise illegal agreement of August 4th. Such a provision was binding on neither the city nor the contractor as neither could validate it by becoming a party to it. The precedent advertising and competitive bidding being wanting in such a contract it was void, and the attempt to infuse life into it by the provision in the original contract was fruitless. To sustain the distinction made by the learned counsel for the appellant between the supplemental contract declared void in Smith v. Philadelphia and the contract of August 4th in the present case would afford the parties an opportunity to do just what the law says they shall not do: enter into municipal contracts without advertising and competitive bidding. If the parties may enter into an agreement such as we have in this case, and legally provide therein for supplemental agreements at the pleasure of the city without complying with the necessary legal prerequisites, the statutes and ordinances regulating municipal contracts will be set at naught, and there will be no limit to the number of supplemental contracts or the amount to be expended thereunder. The favorite contractor would then indeed have a harvest, and the unfaithful city officer would be afforded the opportunity of expending the city's money in defiance of the law which requires advertisement and competitive bidding. The parties cannot evade the law and squander the city's money by any such device.

The decree of the court below is affirmed.

MR. JUSTICE ELKIN, dissenting:

I cannot give my assent to the proposition that the city did not have the power to make the contract in question, and that is one ground upon which the court below and here bases the decision. I fully agree that if there was collusion and fraud either in making the contract or in the performance of work under it, the relief prayed for should be granted. But it is a very different

thing to say that the city could not make, under any cir-
cumstances, a valid contract such as was made in the
present case, even if acting in good faith and for the
general welfare of the public.   To so hold is to deny the
city the right to exercise a power it possesses, even for
a good and wholesome purpose.   For the purposes of
this case it is not necessary to take such an extreme po-
sition, because the rights of the parties could have been
determined upon the facts as found by the learned court
below, without taking from the city a power which in
many instances can be beneficially exercised by munici-
palities.   In the present case there was a previous ap-
propriation, unexhausted; a previous advertisement for
bids covering repairs for the whole year; and a con-
tract which required in express terms the contractors
to do the additional work when requested by the city.
Everything subsequently done was in accordance with
the terms of the original contract which was made after
advertisement upon the basis of competitive bidding.
It is true that the original contract contained a pro-
vision limiting the cost of the work to be done to
$50,000, being the amount of the appropriation then
available for street repairing purposes.   But the con-
tract also provided in terms that as further appropria-
tions became available the city would have the right to
call upon the contractor to continue or complete the
work "at the prices herein provided and in accordance
with the proposal and specifications hereto attached."
In another clause of the contract it was declared to be
the understanding of the parties that the expenditures
for materials and labor were to be limited to $50,000
"unless amended or supplemented as herein provided."
The subject matter was repairs of streets, not new im-
provements, or work of a fixed definite character.   It
is the duty of the city to repair its streets, and this is
a continuing obligation.   In the very nature of things
municipal authorties cannot at the beginning of a year
definitely fix the amount and character of the repairs

which the streets may require during the entire year. The extent and necessity of repairs must be ascertained from time to time by the municipal authorities charged with the duty of inspection.  There is no statutory provision, and there should be no policy of law, requiring successive advertising every time certain streets may need repairs during the year.  All of these things should be contemplated in the original advertisement; the bids should be made upon this basis; and the contract should cover these conditions.  It seems to me this is the proper view to take of the power of a city in dealing with the subject of street repairs.  To deny the city the power to make annual contracts upon a single advertisement, where all the bidders are on equal footing, is to seriously interfere with the orderly conduct of municipal affairs.  The previous advertisement in the present case was for repairs "during the year 1910, as required by the Highway Department," and the work was all done under the contract in that year.  My position is that the city had the power to make such a contract, and in the absence of collusion or fraud, it was binding, according to its terms, upon all parties concerned.  Of course, if there was collusion and fraud, the contract, whether it be called original or supplemental, was vitiated, and the parties could assert no rights under it.  The collusion and fraud charged depend upon the facts and not upon the power of the city to make the contract.

For the reasons stated, I cannot agree with that part of the opinion which in effect declares that the original contract did not cover repairs of street for the whole of the year 1910, and that it required readvertisement as additional repairs became necessary.